**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JARMAIN MERRITT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| | ) | No. 06-cv-6296 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| MARVIN REED, Warden, | ) | |
| Jacksonville Correctional Center,[1] | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 1997, petitioner Jarmain Merritt was convicted of aggravated kidnaping and vehicular hijacking and other counts and sentenced to an extended term of 35 years. Petitioner filed a *pro se* petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, asserting as his primary claim that his trial counsel was ineffective. This Court appointed counsel who filed an amended petition along with a supporting brief. The State filed an Answer arguing that the petition should be dismissed because of procedural default and other defects. Appointed counsel then filed a response to the Answer. For the reasons stated herein, the petition is denied.

---

[1]Marvin Reed, the current warden of the Jacksonville Correctional Center, is substituted as the respondent. *See* Rule 2(a) of the Rules Governing Section 2254 Cases; Fed. R. Civ. P. 25(d); *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

# BACKGROUND

The following facts are taken from Illinois Appellate Court's opinion in petitioner's direct appeal, *People v. Merritt*, No. 1-99-4236 (Ill. App. Ct. May 23, 2002) (Dkt. # 52-1), and are "presume[d] to be true." *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006).

On October 8, 1997, [petitioner] was arrested and charged with the aggravated kidnaping, vehicular hijacking, aggravated battery and unlawful restraint of Ida Dorantes. A bench trial commenced on September 7, 1997, at which the following evidence was presented.

Ida Dorantes (Ms. Dorantes) testified on behalf of the State that on August 30, 1997, at approximately 1:00 p.m., she drove to St. Paul Bank on Roosevelt Road in Oak Park, Illinois, to make a deposit. She left her vehicle unlocked in the bank's parking lot. Ms. Dorantes then drove to Austin Boulevard, and stopped. At that point, a man sat up in the back seat of her vehicle, grabbed her by the neck, and told her to keep driving or he would kill her. Ms. Dorantes told the man that he could take her vehicle, if he would let her go, but the man refused. Ms. Dorantes looked at the man in the rearview mirror while he spoke to her. In court, Ms. Dorantes identified [petitioner] as the man inside the vehicle. Ms. Dorantes continued driving straight for three or four blocks, then stopped the vehicle and pressed on the horn. [Petitioner] told her to stop, and hit her repeatedly on the left side of the head. Ms. Dorantes opened the door and [petitioner] tried to get into the front seat. As Ms. Dorantes was exiting the vehicle, [petitioner] climbed into the front seat, at which point, Ms. Dorantes was face to face with [petitioner]. Ms. Dorantes' neighbor, Raul, then ran over to the vehicle and began to struggle with [petitioner]. Ms. Dorantes ran to her mother's beauty shop nearby and called the police. When the police arrived, Ms. Dorantes described the person who attacked her as a [] black male, between the ages of 25 and 27, 5' 10", 150 pounds, with short curly hair and a thin moustache. On September 2, 1997, Ms. Dorantes went to the police station and described her attacked to an officer who made a composite sketch, which sketch was admitted into evidence. On September 8, 1997, Ms. Dorantes identified [petitioner] from a photographic lineup as her attacker, and on October 8, 1997, she identified [petitioner] in a live lineup.

Raul Martinez (Mr. Martinez) testified on behalf of the State that at about 1:00 p.m. on August 30, 1997, he was standing on Roosevelt Road when he saw a vehicle stop and a man in the back seat began hitting a woman in the head in the front seat. He identified the woman as his neighbor, Ida Dorantes. Mr. Martinez went over to the vehicle and told the man to leave Ms. Dorantes alone. Ms. Dorantes ran away, and Mr. Martinez struggled to pull the man out of the vehicle,

but the man started the vehicle and drove away. Mr. Martinez had an opportunity to view the man's face during the struggle, and he identified [petitioner] in court as the man inside the vehicle. On September 3, 1997, Mr. Martinez identified [petitioner] from the composite sketch at the police station and from a photograph lineup. On October 8, 1997, he identified [petitioner] from a live lineup.

Detective Arthur Borchers (Detective Borchers), a Chicago police officer, testified on behalf of the State that he was assigned to investigate the attack upon Ms. Dorantes, and on September 2, 1997, he spoke with Ms. Dorantes and helped create a composite sketch of her attacker, based on her description. Detective Borchers stated that Ms. Dorantes' vehicle was recovered a few blocks from where she left it on the day of the attack. On September 8, 1997, Detective Borchers learned that [petitioner] had been arrested in connection with a similar incident in Forest Park, Illinois, and he obtained a photograph of [petitioner] for use in a photographic lineup. Detective Borchers' partner, Detective Weber, conducted photographic and live lineups with Ms. Dorantes and Mr. Martinez, and both identified [petitioner] as Ms. Dorantes' attacker. [Petitioner] was arrested and processed, at which time, Detective Borchers learned that [petitioner] was 24 years old, 145 pounds, and 5'11".

Paul Rossi (Mr. Rossi) testified on behalf of the Defense that he was an investigator with the Public Defender's Office, and that he was present when Assistant Public Defender, Julie Harmon (Ms. Harmon), interviewed Ms. Dorantes. During the interview, Ms. Dorantes indicated that she was not able to see her attacker in the rearview mirror, and that she was unable to give a description of her attacker. Mr. Rossi also indicated that he himself interviewed Mr. Martinez, during which interview, Mr. Martinez indicated that he was very uncertain about his identification of [petitioner] in the lineup, and that the mustache as drawn in the composite sketch was too thin.

[Petitioner] testified on his own behalf at trial that on August 30, 1997, between 1:00 p.m. and 5:00 p.m., he was at his family's apartment at East 67th Place, taking care of his children. [Petitioner] stated that his mother and his brother were also present at the same time. [Petitioner] indicated that the first time he ever saw Ms. Dorantes was in court.

Dorothy Burnett (Ms. Burnett), [petitioner's] mother also testified on behalf of the Defense. Ms. Burnett stated that on August 30, 1997, she was at her apartment with [petitioner], planning a birthday party, and [petitioner] did not leave the apartment until 4:00 p.m. Ms. Burnett admitted that she did not tell anyone that [petitioner] had been with her at the time of the attack until two years after [petitioner's] arrest.

At trial, defense counsel attempted to admit the testimony of Ms. Harmon regarding her interviews with Ms. Dorantes. The prosecutor objected to this evidence on the basis that a proper foundation had not been laid and the testimony was cumulative of the testimony offered by Mr. Rossi. The parties stipulated that the testimony of Ms. Harmon would corroborate Mr. Rossi's testimony. The parties also stipulated to the testimony of Howard Burnett,[2] which testimony would corroborate Ms. Burnett's testimony that [petitioner] was convicted of armed violence in 1993 and sentenced to six years imprisonment, convicted of possession of a stolen motor vehicle in 1997 and sentenced to four years imprisonment, and convicted of possession of a controlled substance in 1998 and sentenced to three years imprisonment, which sentence he was serving at the time of trial.

Following the submission of this and other evidence, the trial court found [petitioner] guilty of aggravated kidnaping and vehicular hijacking. At the sentencing hearing, the State presented evidence in aggravation that [petitioner] was previously convicted: (1) of aggravated vehicular hijacking in 1994 and sentenced to four years imprisonment, (2) of armed violence in 1993 and sentenced to six years imprisonment, (3) of possession of a controlled substance in 1998 and sentenced to three years imprisonment. The State sought the imposition of an extended term sentence based on the fact that [petitioner] had been convicted of the Class X felony, armed violence, within the last ten years. The trial court sentenced [petitioner] to an extended term 35 year sentence, which sentence was imposed consecutive to the three year sentence for possession of a controlled substance.

(Dkt. # 52-1 at pp. 2-6.)

Petitioner raised five claims in his direct appeal to the Illinois Appellate Court:

(a)     trial counsel was ineffective for: (1) failing to lay the foundation for and provide the impeachment testimony of petitioner's former attorney, Julie Harmon, who interviewed the eyewitnesses; (2) stipulating that the testimony of Harmon would simply corroborate the testimony of the defense investigator who also attended the interviews; (3) stipulating to the testimony of an alibi witness, petitioner's brother, and specifying only that the witness would corroborate the testimony of petitioner's mother that

---

[2]The remaining part of this paragraph is incorrect to the extent that it suggests that the parties stipulated that petitioner's brother, Howard Burnett, would testify as to petitioner's criminal record.  Although the parties did later stipulate to petitioner's prior criminal history as summarized in this paragraph, the stipulation regarding Mr. Burnett did not concern this history but instead concerned petitioner's alibi.

petitioner was home the day of the kidnaping; and (4) failing to object to the detective's testimony that the eyewitnesses had no doubt when they identified petitioner in the lineup;

(b)     the State did not prove petitioner guilty beyond a reasonable doubt;

(c)     the Act that increased aggravated kidnaping from a Class 1 to a Class X felony violated Illinois's single-subject rule;

(d)     petitioner's extended-term sentence and the fact that the sentence was imposed consecutively to the sentence for possession of a controlled substance were unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the fact of his prior conviction was not proven to a jury beyond a reasonable doubt; and

(e)     petitioner was penalized for maintaining his innocence and going to trial, as evidenced by the disparity between his thirty-five year sentence and the seven-year sentence he was offered during plea proceedings.

(Answer at 2-3.)

In a 12-page order, the Illinois Appellate Court affirmed the conviction. (Dkt. # 52-1.) The Court rejected the ineffective assistance of trial counsel claim holding, among other things, that the decision to stipulate to Harmon's and Burnett's testimony was appropriate and that any failure to object to Detective Borchers' statement about the two eyewitnesses at the lineup was an "isolated omission" that did not affect the outcome of the trial. (*Id.* at 7-8.) As for the insufficiency of the evidence claim, the appellate court found the testimony of the two eyewitnesses was sufficient to support the conviction:

> The record indicates that both Ms. Dorantes and Mr. Martinez had adequate opportunity to view the offender, accurately described the [petitioner's] physical characteristics, and positively identified [petitioner] in lineups shortly after the attack. Although Mr. Rossi testified that Mr. Martinez and Ms. Dorantes expressed doubts about the accuracy of their identifications, it was for the trier of fact to assess witness credibility and resolve any conflicts in testimony.

(*Id.* at 8-9.)

Petitioner filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court. He raised two claims:

(a) the appellate court erred in finding that petitioner waived his argument that the trial court relied on two improper factors in sentencing; and

(b) under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), it was unconstitutional for the trial judge to impose an extended-term sentence based on petitioner's past felony convictions.

(Answer at 3; Ex. F.) The Illinois Supreme Court denied the PLA. (*Id.*; Ex. E.)

Petitioner filed a petition for writ of certiorari which the United States Supreme Court denied on February 24, 2003. (*Id.*)

On October 10, 2002, petitioner filed a *pro se* petition for relief pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.* (Dkt # 52-21.) Petitioner raised a number of claims, including a claim that he was charged in this case because police in Forest Park obtained a statement from George Bolden implicating petitioner in a separate carjacking case, 12 days before the one in this case, but that Mr. Bolden since recanted that statement. (*Id.* at 15.) Petitioner included an affidavit from Mr. Bolden, then in prison, who testified that he lied when he implicated petitioner in the first carjacking. Petitioner also asserted that his trial counsel was not effective because he failed to call Sheriff Horace Hardy and La Shauna Pinkston to give testimony as to petitioner's alibi that he was at home all day. (*Id.* at 17.) Petitioner included an affidavit, dated September 19, 2002, from Mr. Hardy in which he stated that at 1:00 p.m. on August 30, 1997, he was on the phone with petitioner and that he also talked to petitioner's son. (*Id.* at 26.) Mr. Hardy stated that he informed petitioner's trial counsel that he was willing to

testify to these facts. The trial court dismissed the postconviction petitioner as frivolous and patently without merit. (Answer at 4.)

Petitioner appealed to the Illinois Appellate Court, raising four claims:

(a)    trial counsel was ineffective for failing to call Harmon as an impeachment witness and Horace Hardy as an alibi witness;

(b)    the trial court erred by dismissing the petition based on res judicata and waiver;

(c)    the trial court failed to comply with the Illinois statute requiring service on petitioner of the order denying a postconviction petition within ten days; and

(d)    the trial court improperly relied on the State's input in summarily dismissing the postconviction petition.

(*Id.*; Ex. H.)

On August 27, 2004, the Illinois Appellate Court affirmed in a 9-page order, finding that counsel could have reasonably presented Ms. Harmon's testimony by stipulation because it merely corroborated Mr. Rossi's testimony. (Dkt. # 52-7 at 5.) As for the failure to call Sheriff Horace Hardy as an alibi witness, the Court found that this testimony "would have been cumulative at best, and because it would be offered by a friend, it would also be scrutinized for his bias or interest." (*Id.* at 6.)

Petitioner then filed a PLA with the Illinois Supreme Court, raising two issues:

(a)    the trial court failed to comply with the Illinois statute requiring service of the order denying a postconviction petition within ten days;

(b)    the trial court erred by dismissing the petition based on res judicata and waiver.

(Answer at 4.) On December 1, 2005, the Illinois Supreme Court denied the PLA. (*Id.*; Ex. K.)

On November 9, 2006, petitioner filed a state habeas corpus complaint pursuant to 735 ILCS 5/10-101, *et seq.*, which the trial court dismissed on March 23, 2007. (*Id.*; Ex. M.)

Petitioner appealed and raised on claim: he should have been allowed to recharacterize his habeas complaint as a postconviction petition. (*Id.* at 5; Ex. N.) The state appellate court affirmed. (*Id.*; Ex. M.)

Petitioner filed a PLA raising the same claim he raised to the appellate court – namely, he should have been allowed to recharacterize his habeas complaint. On September 30, 2009, the Illinois Supreme Court denied the PLA. (*Id.*; Ex. P.)

On November 17, 2006, petitioner filed his habeas petition with this Court. The case was stayed in February 2007, on petitioner's motion, so that he could exhaust two of the claims in his initial Section 2254 habeas petition via the state habeas corpus proceeding.

On May 14, 2012, petitioner's counsel filed an amended habeas petition in this Court raising these claims:

(a)     trial counsel was ineffective for failing to: (1) move to suppress suggestive identification evidence; (2) investigate and interview potential witnesses; (3) lay a proper foundation for the admission of testimony; (4) object to the admission of testimony vouching for the credibility of another witness; (5) raise violations of due process involving the arrest of petitioner; and (6) object to irregularities at trial and at sentencing in a post trial motion;

(b)     petitioner was denied his Fifth Amendment right to due process and Eighth Amendment right to freedom from excessive sentence, respectively, because he was punished: (1) for his failure to acknowledge guilt; (2) for his decision to go to trial; (3) for his failure to conform to specific religious dictates and "confess his sins" before being sentenced; and (4) for enhancements that were not proven beyond a reasonable doubt;

(c)     appellate counsel was ineffective for failing to argue on direct appeal that: (1) trial counsel failed to raise due process issues regarding petitioner's arrest and state retribution for complaints made against the police; (2) trial

counsel failed to file pre-trial motions regarding the line-up identification; (3) the statute of conviction was applied ex post facto; (4) trial counsel failed to demonstrate that the State did not prove the aggravating factor beyond a reasonable doubt; and (5) trial counsel failed to present expert testimony regarding the limitations of identification testimony; and

(d)     petitioner was denied due process because the State prosecuted this case because the State could not prove another incident, and in retaliation for complaints made to the authorities regarding police action in the investigation of petitioner.

(Answer at 5-6; Dkt. # 44 at 5-6.)

## DISCUSSION

The State argues that all the claims in the amended petition are procedurally defaulted because they were not raised through one complete round in state court or because they were rejected on independent and adequate state law grounds.

In order to receive federal habeas relief, a state prisoner must have properly presented his claims in the state court. *Johnson v. Pollard*, 559 F.3d 746, 751-52 (7th Cir. 2009). A federal court will not review a question of federal law decided by a state court if the state court decision rested on a state procedural ground independent of the federal question and adequate to support the judgment. *Martinez v. Ryan*, 132 S.Ct. 1309, 1316 (2012); *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002).

A claim may also be procedurally defaulted if petitioner fails to raise an issue for "one complete round" of state court review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, one complete round includes two tiers of appellate review; appeal to the Illinois Appellate Court, and a petition for leave to appeal to the Illinois Supreme Court. *Boerckel*, 526 U.S. at 845. One complete round may be either a direct appeal or post-conviction proceedings. *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999).

-9-

In its Answer, the State has set forth in detail the procedural history and explained why the current claims are procedurally defaulted. *See* Answer at pp. 19-23. The primary reason is that petitioner failed to raise his claims in his three petitions for leave to appeal in the Illinois Supreme Court. *Id.* at 21-22. In his response brief, petitioner does not dispute that his claims are procedurally defaulted.[3]

In its Answer, the State acknowledges that petitioner can avoid procedural default under one of two limited exceptions: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Steward v. Gilmore*, 80 F.3d 1205, 1211-12 (7th Cir. 1996). In its Answer, the State explains why petitioner cannot fall within either of these exceptions. As for the first exception, the State points out that, although ineffective assistance of counsel can constitute "cause," petitioner here did not properly raise his ineffective assistance claims in state court. *See* Answer at 25. In his Response, petitioner does not make any argument that he falls within the first exception. Instead, his relies solely on the second exception. (Response at 2 ("His Petition before this Court is based upon his actual innocence of the crime").[4]

---

[3]The State acknowledges that there is an argument that petitioner may not have procedurally defaulted one claim – that his consecutive sentences violated *Apprendi*. *See* Answer at 27-29. The State argues this claim would fail on the merits in any event because *Apprendi* does not apply to consecutive sentences. *Id.* at 29 (citing *Oregon v. Ice*, 555 U.S. 160, 164 (2009)). In his response brief, petitioner does not disagree with this argument.

[4]In addition to arguing that all of petitioner's claims are procedurally defaulted, the State also argues that many of petitioner's claims are also time-barred under AEDPA's one-year statute of limitations. *See* Answer at 11-19. Specifically, the State argues that although petitioner's *pro se* original petition was timely, his amended petition filed by appointed counsel was untimely and those new claims do not relate back to the claims in the original petition. Because this Court has

The law applicable to a claim of actual innocence was summarized by the Seventh Circuit

in *Coleman v. Lemke*, 739 F.3d 342 (7th Cir. 2014):

> As a general matter, federal habeas courts are precluded from considering habeas
> claims that were procedurally defaulted because they were not presented for one
> complete round of state court review. *See O'Sullivan v. Boerckel*, 526 U.S. 838,
> 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). But a petitioner can still obtain review
> of his defaulted claims by establishing that a fundamental miscarriage of justice
> would result from denial of his petition because he or she is actually innocent. *See
> House v. Bell*, 547 U.S. 518, 536-37, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).
> "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet
> the threshold requirement unless he persuades the district court that, in light of the
> new evidence, no juror, acting reasonably, would have voted to find him guilty
> beyond a reasonable doubt.'" *McQuiggin v. Perkins*, __ U.S. __, 133 S.Ct. 1924,
> 1928, 185 L.Ed.2d 1019 (2013) (quoting *Schlup*, 513 U.S. at 329, 115 S.Ct. 851).
> The new evidence may include "exculpatory scientific evidence, trustworthy
> eyewitness accounts, or critical physical evidence – that was not presented at
> trial.'" *House*, 547 U.S. at 537, 126 S.Ct. 2064 (quoting *Schlup*, 513 U.S. at 324,
> 115 S.Ct. 851). The actual innocence standard is a demanding one that "permits
> review only in the 'extraordinary' case." *House*, 547 U.S. at 538, 126 S.Ct. 2064.
> When deciding the ultimate question of innocence, "the habeas court must
> consider all the evidence, old and new, incriminating and exculpatory" and then
> "make a probabilistic determination about what reasonable, properly instructed
> jurors would do." *Id.*

*Id.* at 349.  As the Supreme Court noted in *Schlup*, a claim of actual innocence is "rarely

successful." More recently, the Supreme Court observed that the miscarriage of justice exception

applies to "a severely confined" category of cases. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1933

(2013).

The sole question here is whether this case is one of those rare, extraordinary cases. This

analysis requires that this Court examine all the evidence and ask how a reasonable trier of fact

would view it. This analysis thus does not require that this Court make any determinations about

---

already found that the claims are procedurally defaulted, this Court need not address this
additional argument.

the effectiveness of petitioner's trial counsel who petitioner believes was unprepared and made numerous questionable choices both leading up to and during the trial. Nevertheless, it is worth pointing out that trial counsel's performance was indeed questionable in several respects, including repeatedly missing court dates or showing up several hours late, to the frustration of the trial judge. Obviously, this is not a good way to start a trial, especially a bench trial.

Following the "old and new" framework identified by the Supreme Court, this Court will first examine the "old" evidence – that is, the evidence presented at the bench trial. To summarize, this was basically a two-witness case. There was no physical evidence linking petitioner to the crime scene. The two witnesses were Ms. Dorantes, the victim, and Mr. Martinez, who helped rescue her and fought with the perpetrator. Both witnesses testified about the encounter, which took place at around 1:00 p.m. on August 30, 1997.

Ms. Dorantes testified that police came out immediately after the incident and that she told them the attacker was a black male, 5' 10", 150 pounds, between the age of 25 and 27, with short curly hair and a thin mustache. On September 2, 1997, she helped the police create a composite sketch. On September 8, 1997, she picked petitioner out of a six-person photo array. On October 8, 1997, she picked him out of a line-up.

Mr. Martinez testified that the police came out to the crime scene right after the incident. In his testimony, he did not say whether or not he gave a description at this time. However, on September 3, 1997, he was shown the composite sketch and testified that it looked like petitioner: "you never forget the small mustache." On September 10, 1997, Mr. Martinez picked out petitioner's picture from a photo array but said that he would be 100% sure of the photograph

if he saw the perpetrator in person. On October 8, 1997, Mr. Martinez picked petitioner out of a line-up.

The prosecution also called Detective Borchers, a police officer working for the Oak Park Police Department. He testified that, on September 8, 1997, he learned that petitioner had been arrested and was in the custody of the Forest Park police. Detective Borchers went there and got a picture of petitioner. The picture was used in the photo array shown to Ms. Dorantes on September 8th.

In his case, petitioner put on an alibi defense. His mother testified that petitioner was at home the entire day and never out of her sight for more than five minutes. Counsel then stipulated that petitioner's brother would testify to the same facts. Petitioner testified that he was at home the whole day working on his son's birthday party and only left at 5:00 p.m. when he went to go buy some Pampers for his son.

To attack the credibility of the prosecution's two eyewitnesses, counsel called Paul Rossi, an investigator with the public defender's office. Mr. Rossi had gone with Julie Harmon, the public defender then representing petitioner, to interview Ms. Dorantes on June 3, 1998. Mr. Rossi, by himself, twice interviewed Mr. Martinez. Mr. Rossi testified that Ms. Dorantes said that she never got a clear look at the offender; that she was not able to see him in her rearview mirror; that she was unable to give a description of him to the police; and that nothing about the perpetrator's physical appearance stood out. Mr. Rossi testified that Mr. Martinez said in the two interviews that he "was very uncertain about the facial features and the appearance" of the perpetrator; that "he believed the man was Puerto Rican or a light skinned black man"; and that the composite sketch portrayed the mustache as "too thick" because the perpetrator's mustache

"was much thinner." At the end of his case, trial counsel indicated that the defense wanted to call Julie Harmon who was then on trial in another courtroom. After some back and forth, the parties agreed to stipulate that Ms. Harmon's testimony would corroborate Mr. Rossi's testimony.

A reasonable juror viewing this evidence could find petitioner guilty. In their testimony, the two witnesses came off as credible with no glaring inconsistencies. No evidence was introduced to show that they had any bias or some ulterior motive to frame petitioner. The incident took place in the middle of the afternoon. Ms. Dorantes testified that she talked to the police immediately after the encounter and described the perpetrator. This description was used a few days later to create the composite sketch, one which the trial judge later described as "one of the closest I have ever seen to a person charged in this court." It is true that Ms. Dorantes testified that during the two or three minute car ride she only got a couple of looks at the perpetrator through the rearview mirror. Yet, a trier of fact could still conclude that she was believable and that this look, however brief, was long enough to make a positive identification.

In any event, it is undisputed that Mr. Martinez got a much closer look. He first saw the perpetrator from 10 feet away as the car drove up; then looked at him through the passenger side window as he tried to grab the perpetrator; saw him again after he ran around to the driver's side window and struggled with the perpetrator trying to pull him out of the car. Mr. Martinez hit him at least two times in the face which would by necessity require looking at the perpetrator's face.

The main line of attack against these two witnesses was the impeachment testimony of investigator Rossi. He testified that the two witnesses, in June 1998, made statements to him and public defender Julie Harmon which allegedly showed they had doubt about their initial

identification of petitioner. However, a trier of fact could reasonably decide to discount this impeachment evidence, finding that the in-court testimony of these two witnesses was simply more believable. The interviews were conducted by the attorney and investigator working for petitioner and took place 10 months after the event.

Moreover, a trier of fact could find that the statements allegedly made by these two witnesses are ambiguous and equivocal. For example, although Mr. Rossi reported that Ms. Dorantes said in the interview that she never saw the perpetrator in the rearview mirror and was unable to give a description to the police, Mr. Rossi also testified that Ms. Dorantes told him she did not get a "clear" look at the perpetrator This statement suggests that she did see the perpetrator to some degree, which is not inconsistent with her trial testimony that she only saw him twice from the rearview mirror. The claim that she could not give *any* description whatsoever to the police, who arrived immediately after the encounter, could be viewed by a judge or jury as doubtful.

Similarly, when Mr. Martinez was asked by Mr. Rossi whether the composite sketch was accurate, Mr. Martinez allegedly responded that the mustache in the picture was "too thick" and the perpetrator's mustache "was much thinner." This statement could be interpreted to mean that, other than the thickness of the mustache, the composite was accurate. A trier of fact could also conclude that Mr. Martinez was carefully looking at the picture and was comparing it to a clear and independent image in his own mind. At another point in the interview, Mr. Martinez supposedly stated that the composite "kind of looks like the guy but I am not sure." Again, this statement, while expressing some uncertainty, is not a disavowal and it is also not inconsistent with Mr. Martinez's testimony at trial that he was not 100% certain when he picked out

petitioner's picture from the photo array.  In sum, this Court finds that a trier of fact reasonably could conclude based on the same evidence that petitioner was guilty.

Next this Court must consider the additional or "new" evidence described in the amended petition. Most of this evidence is not really new, but more in the nature of corroborative or cumulative evidence that petitioner believes trial counsel either failed to investigate or failed to aggressively and effectively raise at trial.

Petitioner complains that trial counsel failed to interview four alibi witnesses.  However, counsel did put on an alibi defense, with petitioner and his mother testifying that petitioner never left the home the entire day. Counsel also stipulated that petitioner's brother would have confirmed the same testimony.  Petitioner does not say who the additional alibi witnesses would be, but it is hard so see how additional alibi witnesses (likely other family members or friends such as Horace Hardy) would add much as they would be viewed, as the Illinois Appellate Court noted, as family members or friends who carry a natural bias.

Petitioner argues that trial counsel should not have stipulated that Ms. Harmon's testimony would corroborate Mr. Rossi's and instead should have called her as a live witness. Ms. Harmon's testimony is set forth in an affidavit petitioner submitted with his post-conviction petition. (Doc. # 52-21 at p. 30-31.)  In this affidavit, Ms. Harmon states that in the June 3, 1998 interview, Ms. Dorantes stated that she had only gotten "a glance" at the offender, that she could not see the offender in the rearview mirror, and that she could not describe the offender to police after the incident. (*Id.* ¶ 3.)  She further states that she asked Ms. Dorantes if she could be wrong about her identification and that Ms. Dorantes "shrugged her shoulders and stated, 'I didn't really get a look at him.'" (*Id.* ¶ 5.)  After receiving this answer, Ms. Harmon "asked her again" the

same question, whether Ms. Dorantes could be wrong, at which point Ms. Dorantes "then nodded and said, 'I didn't want to look at him, I was trying to get away.'" (*Id.* ¶ 6.)

For the most part, this testimony simply corroborates what Mr. Rossi said. Ms. Harmon does add a few additional details, such as her statement that she twice asked Ms. Dorantes if she could be wrong. In her first answer, Ms. Dorantes never directly answers whether she could be wrong, stating only that she did not "really" get a look at him. This answer could be interpreted by a trier of fact as merely being a polite way to avoid saying no to Ms. Harmon. The mere fact that Ms. Harmon then asked the same question again could be viewed as leading the witness. The answer, again, is equivocal, as Ms. Dorantes is said to have "nodded" thereby supposedly showing that she agreed that she "could be wrong," itself a vague statement, which she follows up with the equivocal statement that she didn't "want to" look at the perpetrator. In sum, it is unlikely that Ms. Harmon's live testimony would significantly change the mind of a reasonable trier of fact.

Petitioner also relies on possible physical evidence that he believes could have helped him. Specifically, he complains that counsel failed to investigate whether the bank videotapes and the fingerprint evidence taken from the rearview mirror might have been exculpatory. Because trial counsel never testified in a postconviction hearing, it is not known whether he ever examined this evidence or whether he instead looked at it and found nothing helpful. At trial, counsel did refer to this evidence, arguing that petitioner's fingerprints were not found on the steering wheel and that no videotapes from the bank had been introduced linking petitioner to the scene. In closing, counsel emphasized the lack of any physical evidence.

As noted above, in evaluating an actual innocence claim, the focus is on the evidence available now, not on what counsel may have done. Although petitioner faults counsel for not investigating this evidence, he has not pointed to any evidence suggesting that these two pieces of evidence would have been helpful.[5] Moreover, he has not argued that these two pieces of evidence still exist such that they could be re-examined for possible clues nor has he argued that these questions could somehow be fleshed out at an evidentiary hearing. Petitioner's appointed counsel has already hired a private investigator.

Finally, petitioner advances two theories as to why police might have framed him by manipulating the two eyewitnesses into falsely identifying him. These are set forth in Count 5 of his amended petition. His first theory is that "the State could not prove another incident," which refers to a carjacking that took place in the same area 12 days before this case. The second is that police were retaliating against him because his family complained to the Internal Affairs Officers about a search of their home.

These two theories are not enough to establish actual innocence. While not illogical, they have little concrete evidence to support them and rest on speculations derived from the rough chronological overlap of events.

_____

[5]The available evidence suggests that the videotapes would not have been helpful. The prosecutor represented in closing argument that "[t]here is no videotape in the parking lot." Although not discussed at trial, the police report likewise states that detectives looked at the two videotapes, but they "did not show either the victim or any possible suspects, as the angle of the camera [] was not directed where the victim was parked." Moreover, petitioner's original counsel, public defender Julie Harmon, worked on this case and interviewed the victim. She has provided an affidavit about that interview, but she does not state in the same affidavit that the videotape or fingerprint evidence was helpful. As for the fingerprint evidence, it was taken from the rearview mirror. It is not clear that the perpetrator ever touched the rearview mirror during his struggle with Mr. Martinez or during his drive a couple of blocks before he abandoned the car.

The first theory arises out of the fact that there were two carjackings being investigated at the same time. Sometime around September 3, 1997, police arrested George Bolden in connection with the first carjacking. Bolden allegedly told police that he and a man named "Jarmain" came to Oak Park to "get a car." This statement led police to petitioner (Jarmain Merritt) who was arrested on September 6th on a drug charge. On September 8, 1997, the victim from the first carjacking (Ms. Coady) viewed a lineup but was unable to identify petitioner as a culprit. That same day, Ms. Dorantes identified petitioner's picture from a photo array. Petitioner speculates that police, frustrated by the failure to charge him in the first carjacking, then decided to frame him for the second carjacking.

Petitioner's theory rests on weak inferences. It is true that the two investigations ran parallel and, specifically, that on September 8th the victim in the first carjacking failed to identify petitioner and then Ms. Dorantes in this case did identify petitioner. However, in court, Ms. Dorantes testified that she twice gave a description of petitioner *before* September 8th, first immediately after the kidnaping on August 30th and then on September 2nd when she helped police create a composite sketch. Thus, for petitioner's theory to work, the detectives would have had to not only manipulate Ms. Dorantes into picking out petitioner on September 8th, but would have also had to make up backdated police reports about these two earlier events. Petitioner has pointed to Mr. Rossi's testimony that Ms. Dorantes told him in June 1998 that she was unable to give a description to police right after the event. At best, however, this would mean that the jury could reasonably determine which of two witnesses to believe. This is not enough to establish actual innocence. *See, e.g.*, *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) ("Smith has put forth the statements of two witnesses not called at trial, one of whom Smith apparently knew

about since 1992. This does not sufficiently counter the state's two eye witness identifications and the evidence of Smith's self-inculpating statement[.]").

Although petitioner believes that detectives in this situation might have been desperate enough to frame him, an equally reasonable assumption is that the detectives were honestly following the evidence where it led them.[6] They received a lead connecting petitioner to the first carjacking. When that investigation did not pan out, they did not push things and did not charge the suspect with that crime, arguably showing that they were reasonable and judicious in who they charged. Detectives then investigated whether there was evidence connecting the same suspect to a similar crime, in the same area, during the same general time. When the second victim was able to identify petitioner, then detectives arrested petitioner for that crime. The mere fact that police may have wondered whether the same person was involved in the two crimes is not unreasonable on its face. Nor is there anything illogical in charging a suspect for only one of the two crimes. In short, this theory lacks sufficient evidence to meet the actual innocence standard.[7]

The other theory – that police charged petitioner to retaliate against petitioner's family's for filing a compliant about an alleged illegal search – is even more speculative. The timing does not appear to match up. The house search took place on September 5, 1997, then petitioner's

_____

[6] The facts are not clear about who all the detectives were on these two cases and exactly how they worked together.

[7] Although petitioner raises this theory in Count 5 of his amended petitioner, in his response brief, he also complains at the same time that trial counsel "allowed the introduction of mention of other vehicle highjackings for which Mr. Merritt was not charged." (Resp. at p.4.) It is not clear how to reconcile these two criticisms because to advance the first theory would necessarily require mentioning the first carjacking.

family complained, and then an investigation allegedly took place. Petitioner has not supplied the Court with dates of the latter two events. So it is not clear that the latter two events took place before the key investigative steps in this case. As noted above, Ms. Dorantes testified that she worked with police to create a composite sketch on September 2nd, which would have been before the search of the home, much less the filing of the complaint and subsequent investigation. Moreover, the same criticisms applied to the first theory are applicable to this one. There is no specific evidence suggesting police were motivated by retaliation, and a reasonable trier of fact could not rely solely on a general assumption that police would be so upset by the filing of a complaint against them that they would frame a defendant.

In sum, the new evidence and theories raised by petitioner in his amended petition and two briefs filed by appointed counsel do not constitute the type of "powerful evidence" courts have required to establish actual innocence to avoid procedural default. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence; perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.").

For the reasons stated herein, this Court denies Jarmain Merritt's habeas corpus petition. This Court declines to issue a certificate of appealability. Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

Date: October 9, 2014

Enter:

Sharon Johnson Coleman
United States District Court Judge